UNITED STATES DISTRICT COURT      FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                          :
BATSHEVA ACKERMAN, RUSLAN         :
ANTONOV, JAMES KOH, JERRAD PELKEY,:
JACK PETTY, and PHYLLIS VALENTINE,  :
individually and on behalf of those similarly  :
situated,                               :
                                    :     MEMORANDUM
                    *Plaintiffs*,      :     AND ORDER
                                  :
       - against -             :
                                  :
                                  :     CV-09-0395 (JG) (RML)
THE COCA-COLA COMPANY and        :
ENERGY BRANDS INC. (d/b/a GLACEAU),  :
                                :
                   *Defendants*.    :
---------------------------------------------------------X

A P P E A R A N C E S:

        REESE RICHMAN, LLP
            875 Avenue of the Americas
            18th Fl.
            New York, NY 10001
        By:   Michael R. Reese
            Kim E. Richman
            *Attorneys for Plaintiff*

        WHATLEY DRAKE & KALLAS, LLC
            1540 Broadway, 37th Fl.
            New York, NY 10036
        By:   Deborah Clark-Weintraub
            *Attorney for Plaintiff*

        CENTER FOR SCIENCE IN THE PUBLIC INTEREST
            5646 Milton Street, Suite 211
            Dallas, TX 75206
        By:   Stephen Gardner
            *Attorney for Plaintiff*

        SHOOK, HARDY & BACON, LLP

2555 Grand Blvd.
Kansas City, MO 64108
By:    James R. Eiszner
*Attorney for Defendants*

EMERY, CELLI, BRINCKERHOFF & ABADY, LLP
75 Rockefeller Plaza, 20th Fl.
New York, NY 10019
By:    Andrew Celli
*Attorney for Defendants*

THE COCA-COLA COMPANY
One Coca-Cola Plaza
Atlanta, Georgia 30313
By:    Russell S. Bonds
Brian Howard
*Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

In October 2009, the plaintiffs in the above-captioned putative class action filed a

Second Amended Complaint against The Coca-Cola Company ("Coca-Cola") and Energy

Brands Inc., d/b/a/ Glaceau ("Glaceau") (collectively "defendants"), alleging claims of: (1)

unlawful business acts and practices in violation of California Business and Professions Code

("Cal. BPC") § 17200 *et seq.* ("Unfair Competition Law" or "UCL"); Cal. BPC § 17500 *et seq.*

("False Advertising Law" or "FAL"); and California's Consumers Legal Remedies Act, Cal.

Civ. Code § 1750 *et seq.* ("CLRA"); (2) unfair business acts and practices in violation of

California UCL; (3) fraudulent business acts and practices in violation of California UCL; (4)

misleading and deceptive advertising in violation of California FAL; (5) untrue advertising in

violation of California FAL; (6) unfair methods of competition or unfair or fraudulent acts or

practices in violation of § 1770(a)(7) of the CLRA; (7) deceptive acts or practices in violation of

New York General Business law ("GBL") § 349; (8) false advertising in violation of New York

2

GBL § 350; (9) violation of New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 *et seq.*; (10) breach of an express warranty; (11) breach of an implied warranty of merchantability; (12) deceit and/or misrepresentation; and (13) unjust enrichment.  The claims are brought on behalf of three purported classes of plaintiffs: "[a]ll California Residents who purchased vitaminwater at any time from January 15, 2005 to [the] present," (the "California Class"); "[a]ll New York residents who purchased vitaminwater at any time from January 30, 2003 to [the] present," (the "New York Class"); and "[a]ll New Jersey residents who purchased vitaminwater at any time from January 22, 2003 to [the] present" (the "New Jersey Class").[1]  Claims one through six are brought on behalf of the California class, claims seven and eight on behalf of the New York Class, claim nine on behalf of the New Jersey Class, and claims ten through thirteen on behalf of all three classes.

        The defendants have moved to dismiss on grounds of: (1) federal preemption and (2) failure to satisfy the pleading standards of Federal Rules of Civil Procedure 8 and 9(b).  For the reasons set forth below, defendants' motion is granted with respect to claims nine, ten and eleven and denied in all other respects.

                                BACKGROUND

        The following facts are drawn from the Second Amended Complaint ("Sec. Am. Compl.") and are assumed to be true for the purposes of this motion.

A.      *The Parties*

                Plaintiff Batsheva Ackerman is a resident of New York.  Plaintiffs Ruslan

---

        [1]        Each class excludes "officers and directors of Defendants, members of their immediate families, and the[ir]. . . legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest."

Antonov, James Koh and Jerrad Pelkey are residents of California.  Plaintiffs Jack Petty and

Phyllis Valentine are residents of New Jersey.  Defendant Coca-Cola is a Georgia corporation

headquartered in Atlanta, Georgia, and describes itself, according to the Second Amended

Complaint, as the largest manufacturer, distributor and marketer of nonalcoholic beverage

concentrates and syrups in the world.  Defendant Glaceau, a wholly owned subsidiary of Coca-

Cola, produces the beverage "vitaminwater,"[2] is headquartered in Whitestone, New York.

B.      *Procedural History*

This lawsuit is a hybrid of five substantially similar cases that had been

previously filed in California, New York and New Jersey.  Suit was commenced in this court by

plaintiff Batsheva Ackerman by the filing of a complaint on January 29, 2009 on behalf of

herself and a class consisting of all New York State residents who purchased vitaminwater

within three years of the filing of the Complaint.

An amended complaint filed on May 26, 2009 added Ruslan Antonov, James Koh

and Jerrad Pelkey as plaintiffs, representing a class of "all California residents who purchased

vitaminwater at any time from January 15, 2005 to the present."  *Id.* at ¶ 30.  Antonov, Koh and

Pelkey had previously been plaintiffs in suits filed in California federal courts, alleging similar

claims.[3]

On June 1, 2009, defendants filed a motion with the Judicial Panel on

Multidistrict Litigation ("JPML") for transfer of this case, together with another pending case,

_____

[2]        Plaintiffs refer to the product as "VitaminWater."  This opinion adopts defendants' lower-case spelling of "vitaminwater."

[3]        *See Antonov v. Coca-Cola Co.* No. 4:2009cv02200  (N.D. Ca., filed May 19, 2009); *Koh v. Coca-Cola Co.*, No. 3:2009cv00182 (N.D. Ca., filed Jan. 14, 2009); *Pelkey v. Coca-Cola Co.* No. 2:2009cv01239 (C.D. Ca., filed Feb. 20, 2009).

*Thomas Mason, et al. v. The Coca-Cola Company and Energy Brands, Inc.*, Case No. 1:09-cv-00220-NLH-JH (D.N.J., filed Jan. 14, 2009) ("the New Jersey Action"), to the Northern District of California for coordinated pretrial management pursuant to 28 U.S.C. § 1407. Defendants filed a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6) on June 22, 2009.  On July 6, 2009, the Honorable Charles P. Sifton stayed the briefing schedule for that motion until the JPML ruled on defendants' motion for coordination and transfer.[4]  On August 6, 2009, the JPML denied defendants' motion to transfer.[5]  Plaintiffs filed the Second Amended Complaint on October 6, 2009, adding as plaintiffs Jack Petty and Phyllis Valentine, who had been plaintiffs in the New Jersey Action.  On October 26, 2009, defendants filed the instant motion to dismiss.

This court has jurisdiction pursuant to 28 U.S.C. § 1332(d), because the aggregate claims of the class exceed $5,000,000 and minimal diversity exists between the proposed class members and defendants.

C.    *The Federal Regulatory Scheme*

The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 343 *et seq.* ("FDCA"), was enacted in 1938 as a successor to the 1906 Pure Food and Drugs Act, 34 Stat. 768, *repealed by* Act of June 25, 1938, ch. 675, § 902(a), 52 Stat. 1059, which had been the first comprehensive federal legislation designed to protect consumers from fraud or misrepresentation

---

[4]    This matter was originally assigned to the late Judge Charles P. Sifton.  It was transferred to me on November 24, 2009.

[5]    The JPML found that: (1) the litigation involved only two actions; (2) common questions of fact were not sufficiently complex and/or numerous to justify transfer; (3) alternatives to transfer existed which could minimize duplicative discovery and/or inconsistent pretrial rulings; and (4) plaintiffs in the New Jersey Action had attempted to dismiss their action and join in the complaint in the Eastern District of New York, which would have negated the multidistrict character of the litigation.  *See* MDL Order, *In re: Glaceau VitaminWater Mktg. and Sales Practices Litig.*, MDL No. 2080 (August 6, 2009).

in the sale of food and drugs.  *See generally*, James T. O'Reilly, *Food and Drug Administration* § 3:1-13 (3d ed. 2009).  The FDCA empowers the Food and Drug Administration ("FDA") to (a) protect the public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled," 21 U.S.C. § 393(b)(2)(A); (b) promulgate regulations pursuant to this authority; and (c) enforce its regulations through administrative proceedings.  *See* 21 C.F.R. § 7.1 *et seq*.  The FDCA deems a food as "misbranded" if its labeling "is false or misleading in any particular."  21 U.S.C.A. § 343(a).  There is no private right of action under the statute.  *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 810 (1986).

In 1990 Congress amended the FDCA by enacting the Nutrition Labeling and Education Act (the "NLEA"), codified as amended at 21 U.S.C. §§ 301, 321, 337, 343, 371. "The NLEA was passed to 'clarify and to strengthen the Food and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about the nutrients in foods.'"  *Nutritional Health Alliance v. Shalala*, 144 F.3d 220 (2d Cir. 1998) (citing H.R. Rep. No. 101-538, at 7 (1990)).  The NLEA amended the FDCA in several significant respects: it expanded the coverage of nutrition labeling requirements; it changed the form and substance of ingredient labeling on packages; it imposed limitations on health claims; it standardized the definitions of all nutrient content claims; and it required more uniform serving sizes.  *See The Impact of the Nutrition Labeling and Education Act of 1990 on the Food Industry*, 47 Admin. L. Rev. 605, 606 (1995).  The NLEA also added a preemption provision to Section 403A of the FDCA.  It states, in relevant part:

Except as provided in subsection (b),[6] no State or political subdivision of a State

---

6        21 U.S.C. § 343-1(b) provides a mechanism by which a state may petition the FDA for an exemption from the FDCA's preemption provision.  It is not relevant to the instant suit.

> may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce
>
> . . . .
>
> (5) any requirement respecting any claim of the type described in section 343(r)(1) of this title [*i.e.*, nutrition levels and health-related claims], made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title . . . .

21 U.S.C. § 343-1(a)(5) ("Section 403A").

Section 343(r)(1) of the NLEA describes claims in the labeling of food[7] that "expressly or by implication," "characterize[] the level of any nutrient" or "characterize[] the relationship of any nutrient . . . to a disease or health related condition . . . ." 21 U.S.C. § 343(r)(1). The FDA has promulgated regulations concerning three different kinds of claims of the type described in Section 343(r)(1): express nutrient-content claims, implied nutrient-content claims, and health claims. *See* 21 C.F.R. §§ 101.13 (defining express and implied nutrient-content claims), 101.14 (defining health claims). An express nutrient-content claim is a direct statement about the level or range of a nutrient in a food, such as "low sodium" or "100 calories." 21 C.F.R. § 101.13(b)(1). An "implied nutrient-content claim" is a statement

---

[7]    Plaintiffs alternately refer to vitaminwater as a food or "dietary supplement." *See, e.g.*, Sec. Am. Compl. ¶ 15 (referring to vitaminwater as a "dietary supplement beverage."). Although neither party asserts that this distinction is significant to the present suit, it is quite clear that vitaminwater is in fact a food rather than a dietary supplement. *See* Final Rule, *Food Labeling; Requirements for Nutrient Content Claims, Health Claims, and Statements of Nutritional Support for Dietary Supplements*, 62 Fed. Reg. 49859, 49862 (Sept. 23, 1997) ("whether a product is a dietary supplement or a conventional food will depend on how it is labeled. To be a dietary supplement, a product must bear the term 'dietary supplement' as part of its common or usual name."). *See also* FDA Draft, *Guidance for Industry: Factors that Distinguish Liquid Dietary Supplements from Beverages, Considerations Regarding Novel Ingredients, and Labeling for Beverages and Other Conventional Foods* (December 2009) (noting in non-binding recommendation that "Beverages are conventional foods under the [FDCA]. Even when the label of a liquid product characterizes it as a dietary supplement, the product may not in fact be a dietary supplement."), *available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/ucm192702.htm (last visited July 2, 2010); *see generally* Leah A. Satine, *Is my Yogurt Lying? Developing and Applying a Framework for Determining Whether Wellness Claims on Probiotic Yogurts Mislead*, 63 Food & Drug L.J. 537, 545-46 (2008) (noting that the FDA has interpreted the category of dietary supplements narrowly in circumstances where a product contains properties of both conventional foods and dietary supplements).

suggesting "that a nutrient or an ingredient is absent or present in a certain amount," such as

"high in oat bran," (suggesting a high dietary fiber content), a statement such as "as much fiber

as an apple," which suggests a nutrient level comparable to a specified reference food, or a

"general nutritional claim," (a subcategory of an implied nutrient claim) consisting of an express

or implied claim that the nutrient content of a food may help consumers maintain healthy dietary

practices.  *See* 21 C.F.R. §§ 101.13(b)(2)(i)-(ii); 21 C.F.R. § 101.65.  A claim that a product is

"healthy" is generally an implied nutritional content claim.[8]  "Health claims" by contrast,

specifically "characterize[] the relationship of any substance to a disease or health-related

condition."  21 C.F.R. 101.14.

D.    *The State Regulatory Schemes*

California, New York and New Jersey broadly prohibit the misbranding of food in

language largely identical to that found in the FDCA.  California's Sherman Food, Drug, and

Cosmetic Law (the "Sherman Law"), Health & Saf. Code § 109875 *et seq.*, provides that food is

misbranded "if its labeling is false or misleading in any particular."  *Id.*  The Sherman Law

explicitly incorporates by reference "[a]ll food labeling regulations and any amendments to those

regulations adopted pursuant to the [FDCA]," as the food labeling regulations of California.  Cal.

---

[8]      The FDA has explained that while use of the term "healthy" typically constitutes an implied
nutrient content claim, it could, in some circumstances, constitute a health claim where it is used in reference to a
disease or health-related condition.  *See* Final Rule, *Food Labeling; General Requirements for Health Claims for
Food*:

> In the case of the word "healthy," the agency does not believe that the use of this word would
> normally be a health claim.  "Healthy" has a wide variety of meanings in addition to ones that
> would satisfy the second basic element of a health claim.  For example, "healthy" can certainly
> imply general nutritional well-being.  Thus, while a claim such as "Eat a diet low in fat for a
> healthy heart" may be a health claim, "Eating five fruits or vegetables a day is a good way to a
> healthy lifestyle" is not.  Moreover . . . [the] FDA may also regulate the term "healthy" . . . as an
> implied nutrient content claim.

58 Fed. Reg. 2478-01, 2483-84 (Jan. 6, 1993).

Health & Saf. Code, § 110100, subd. (a).  New York's Agriculture and Marketing law similarly

provides in relevant part that food shall be deemed misbranded "[i]f its labeling is false or

misleading in any particular," and incorporates the FDCA's labeling provisions found in 21

C.F.R. part 101.  Agriculture and Markets Law § 201(1); N.Y. Comp. Codes R. & Regs. tit. 1, §

259.1.  Likewise, New Jersey law provides that "a food shall . . . be deemed misbranded . . . [i]f

its labeling is false or misleading in any particular," and incorporates by reference the FDCA's

labeling regulations in 21 C.F.R. part 101.  N.J.S.A. 24:5-17 (a), N.J. Admin. Code tit. 8,

§ 24-3.6.  California, New York, and New Jersey each also discourage the misbranding of food

through the availability of remedies pursuant to the respective state's consumer protection laws.

DISCUSSION

A.      *The Standard of Review*

Motions to dismiss pursuant to Rule 12(b)(6) test the legal, not the factual,

sufficiency of a complaint.  *See, e.g.*, *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule

12(b)(6) stage, 'the issue is not whether a plaintiff is likely to prevail ultimately, but whether the

claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143

F.3d 698, 701 (2d Cir. 1998))).  Accordingly, I must accept the factual allegations in the

complaint as true, *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (per curiam), and draw all

reasonable inferences in favor of the plaintiff.  *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465,

469 (2d Cir. 1995).  However, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 129 S. Ct.

1937, 1949 (2009).

In *Iqbal*, the Supreme Court provided additional guidance regarding the

9

consideration of motions to dismiss under Rule 12(b)(6).  Citing its earlier decision in *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Court explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to state a claim to relief that is plausible on its face.  A
> claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged.

*Iqbal*, 129 S. Ct. at 1949 (internal citations and quotation marks omitted).  Pursuant to Fed. R.

Civ. P. 9(b), the circumstances of fraud or mistake must be pleaded with particularity.  *See, e.g.*,

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 663 (2d Cir. 1997).

When considering a motion to dismiss, a court may examine (1) the factual

allegations in the complaint, which are accepted as true; (2) documents attached to the complaint

as exhibits or incorporated in it by reference; (3) matters of which judicial notice may be taken;

and (4) documents either in the plaintiff's possession or of which the plaintiff had knowledge

and relied on in bringing suit.  *Brass v. Am. Film Techs., Inc*., 987 F.2d 142, 150 (2d Cir. 1993).

B.      *Plaintiffs' Claims*

Plaintiffs' state law claims are premised on twelve allegedly misleading

statements made in connection with the labeling of vitaminwater:

1. The description of the product as a "Nutrient-Enhanced Water Beverage";

2. The phrase "vitamins + water = all you need" on the product label;

3. Flavor names such as "rescue" and "defense";

4. The name "vitaminwater" itself;

5. The statement "vitamins + water = what's in your hand" on in-store
   advertising materials;

6. The statement "this combination of zinc and fortifying vitamins can . . . keep

you healthy as a horse" on the label of vitaminwater's "defense" flavor;

7.  The statement "specially formulated to support optimal metabolic function with antioxidants that may reduce the risk of chronic diseases, and vitamins necessary for the generation and utilization of energy from food" on the label of vitaminwater's "rescue" flavor;

8.  The statement "specially formulated to provide vitamin [A] (a nutrient known to be required for visual function), antioxidants and other nutrients [that] scientific evidence suggests may reduce the risk of age-related eye disease" on the label of vitaminwater's "focus" flavor;

9.  The statement "specially formulated with bioactive components that contribute to an active lifestyle by promoting healthy, pain-free functioning of joints, structural integrity of joints and bones, and optimal generation and utilization of energy from food" on the label of vitaminwater's "balance" flavor;

10.  The statement "specially formulated with nutrients required for optimal functioning of the immune system, and the generation and utilization of energy from food to support immune and other metabolic activities" on the label of vitaminwater's "defense" flavor;

11.  The statement "specially formulated with [B] vitamins and theanine.  The [B] vitamins are there to replace those lost during times of stress (physical and mental).  Theanine is an amino acid found naturally in tea leaves and has been shown to promote feelings of relaxation.  This combination can help bring about a healthy state of physical and mental being" on the label of vitaminwater's "B-relaxed" flavor;

12.  The statement "specially formulated with nutrients that enable the body to exert physical power by contributing to structural integrity of the musculoskeletal system, and by supporting optimal generation and utilization from food" on the label of vitaminwater's "Power-C" flavor.[9]

Plaintiffs no longer contend that the particular vitamins in vitaminwater fail to provide the

---

[9]     The initial complaint identified numerous additional allegedly misleading statements.  *See* Compl. ¶ 18.  Plaintiffs' papers on the instant motion suggest that they excluded from the Second Amended Complaint the statements most clearly regulated by the FDA so their suit would escape the bar of federal preemption.  *See infra* note 19.  Although it would not have altered the outcome of the motion, I do not consider the statements plaintiffs excluded from their Second Amended Complaint.  *See Harris v. City of New York*, 186 F.3d 243, 249 (2d Cir. 1999) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quoting *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1128 (2d Cir. 1994))).

benefit claimed.[10]  Rather, they claim that vitaminwater's labeling and marketing is misleading

because it: (1) "bombard[s] consumers with a message of purported benefits, and draw[s]

consumer attention away from the significant amount of sugar in the product,"  Sec. Am. Compl.

¶ 6; (2) portrays vitaminwater as healthy when it is essentially a snack food that provides

nutritional benefits solely because it has been specifically fortified to do so, *see* Sec. Am. Compl.

¶ 57; and (3) suggests that vitaminwater contains nothing but vitamins and water.  *See* Sec. Am.

Compl. ¶ 26.

C.     *Preemption*

        Defendants argue that plaintiffs' claims should all be dismissed because they are

expressly preempted by federal law, or in the alternative, because they are barred by implied

conflict preemption.

        Under the Supremacy Clause, U.S. Const., Art. VI, cl.2, state laws that "interfere

with, or are contrary to the laws of Congress, made in pursuance of the constitution" are invalid.

*Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 211 (1824).  An otherwise valid state law is preempted

if: (1) Congress expressly preempts the state law; (2) Congress completely occupies the law's

field of operation; (3) compliance with both federal and state law is impossible; or (4) the state

law presents an obstacle to the achievement of the full purposes and objectives of Congress.  *See*

*Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 603-07 (1991).  The Supreme Court has

instructed that the task of determining whether a federal statute has preempted state law is

guided by two basic principles.  First, "the purpose of Congress is the ultimate touchstone in

---

[10]        A claim to that effect was included in the initial complaint.  *See* Complaint ¶ 5 (alleging that "certain vitamins purported to be contained in vitaminwater beverages are not benefiting consumers the way Defendants' claim (e.g., are incapable of being absorbed by the body or fail to maintain a potency between date of bottling and date of consumption).").

every pre-emption case." *Wyeth v. Levine*, 129 S. Ct. 1187, 1194 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  "Second, [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 1194-95 (quoting *Lohr*, 518 U.S. at 485) (quotation marks omitted).  The presumption against preemption has been recognized in matters of public health and safety, including the regulation of food and drugs.  *See, e.g.*, *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985); *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009).  Moreover, where Congress provides an express preemption clause, the presumption against preemption requires courts to read the clause narrowly.  *See Lohr*, 518 U.S. at 485 (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518 (1992)).

Because Section 403A(a)(5) preempts any state requirement that is different than the FDCA's regulation in Section 343(r)(1), there are two ways plaintiffs may escape its preemptive force: (1) if the plaintiffs' claims seek to impose requirements that are identical to those imposed by the FDCA; or (2) if the requirements plaintiffs seek to impose are not with respect to claims of the sort described in Section 343(r)(1).  With regard to the first exception, the Supreme Court has held that "in the context of express preemption provisions, 'the term "requirements". . . reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties.'"  *In re PepsiCo, Inc., Bottled Water Mktg. and Sales Practices*, 588 F. Supp. 2d 527, 532 (S.D.N.Y. 2008) (citing *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 443 (2005)); *see also Riegel v. Medtronic, Inc.*, 552 U.S. 312, 325 (2008) ("excluding

common-law duties from the scope of pre-emption would make little sense"); *Cipollone*, 505 U.S. at 522 ("common-law damages actions. . . are premised on the existence of a legal duty, and it is difficult to say that such actions do not impose 'requirements or prohibitions'").  However, a state statute mirroring its federal counterpart does not impose any additional requirement merely by providing a damage remedy for conduct that would otherwise violate federal law, even if the federal statute provides no private right of action.  *See Bates*, 544 U.S. at 432 (preemption of additional *requirements* "[does] not preclude States from imposing different or additional *remedies*") (emphasis in original); *see also Medtronic,* 518 U.S. at 513 (O'Connor, J., concurring in part and dissenting in part) ("[T]he threat of a [state law] damages remedy" does not impose a "requirement" where "the requirements imposed on [defendants] under state and federal law do not differ.").  Accordingly, claims under state laws that parallel the FDCA's requirements are not preempted.[11]

A plaintiff's claims may avoid preemption under the second exception even if they seek to impose additional "requirements" on a defendant, as long as any such requirement is not "respecting any claim of the type described in Section 343(r)(1)."  21 U.S.C. § 343-1(a)(5). That section describes claims made in the label or labeling of food; thus, claims based on statements contained in an advertisement may not be preempted unless the advertisement qualifies as labeling under the FDCA.[12]  In addition, Section 403A preempts only claims based

---

[11]     The FDA has taken a similar position.  *See, e.g.*, Final Rule, *Beverages: Bottled Water*, 60 Fed. Reg. 57076, 57120 (Nov. 13, 1995) ("[I]f the State requirement does the same thing that the Federal law does, even if the words are not exactly the same, then it is effectively the same requirement as the Federal requirement . . . . the only State requirements that are subject to preemption are those that are affirmatively different from the Federal requirements on matters that are covered by section 403A(a) of the act.").

[12]     Plaintiffs contend that defendants' preemption arguments cannot apply to the statement "vitamins + water = what's in your hand" because it was made on "in-store advertising" rather than labeling.  *See* Pl. Br. at 3; Sec. Am. Coml. ¶ 25.  That contention rests on the erroneous assumption that a statement must be physically affixed

on statements that expressly or by implication characterize the level of a nutrient or the

relationship of a nutrient to a disease or health related condition; claims based on statements not

falling into those categories are not preempted. Further, breach of warranty claims are generally

not preempted because they are not requirements "'imposed under State law,' but rather imposed

by the warrantor." *Cipollone*, 505 U.S. at 525-26; *see also Bates*, 544 U.S. at 444-45

(concluding warranty was "a contractual commitment that [defendant] voluntarily undertook by

placing that warranty on its product," and therefore was not preempted by federal law).

However, only those breach of warranty claims based on statements not required by federal

regulations will avoid the bar of preemption; a breach of warranty claim premised on a statement

that is mandated by federal statute would clearly impose a requirement contrary to federal law.

*See Horowitz v. Stryker Corp*., 613 F. Supp. 2d 271 (E.D.N.Y. 2009) (citation omitted); *see also

Duvall v. Bristol-Myers-Squibb Co.*, 103 F.3d 324 (4th Cir. 1996) (in the context of a suit

concerning allegedly defective medical device, express warranty claim is preempted only "to the

extent that the claim is based on FDA-mandated labeling, packaging, or advertising.").

   Accordingly, I must analyze the FDCA's labeling requirements for nutrition

---

to a product to constitute "labeling." The FDCA defines labeling to include "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). The definition of "accompanying" has been interpreted broadly to include statements not attached to the product itself. *See, e.g.*, *Kordel v. U.S.*, 335 U.S. 345, 350 (1948) (no physical attachment between the label and product is necessary); *U.S. v. 24 Bottles Sterling Vinegar and Honey Aged in Wood Cider*, 338 F.2d 157, 159 (2d Cir. 1964) ("The distinguishing characteristic of a label is that, in some manner or another, it is presented to the customer in immediate connection with his view and his purchase of the product."); *see generally* Louis Altman and Malla Pollack, 1A *Callmann on Unfair Comp., Trademarks & Monopolies* § 5:9 (4th Ed. 2009) ("The original distinction between labels and other advertising matter has . . . been blurred."); Sarah E. Taylor, and Harold J. Feld, *Promoting Functional Foods and Nutraceuticals on the Internet*, 54 Food & Drug L.J. 423, 446 (1999) (surveying case law and concluding "[i]f the matter is part of an integrated scheme to promote the product, with a readily discernible nexus between product sales and the matter, the representation will constitute labeling."). Because the statement "vitamins + water = what's in your hand" accompanied the sale of vitaminwater, it constitutes a statement made in the "labeling" under 21 U.S.C. § 321(m) and therefore does not enjoy any special exemption from the preemption provision of Section 403A.

levels and health-related claims and then determine whether the plaintiffs' state law causes of action: (1) impose requirements that are identical to those imposed by federal law; or (2) impose additional requirements, but not respecting nutrition and health related claims.

      1.    *Violation of FDA Regulations*

      Plaintiffs contend that their state law claims are not preempted because they are based on misleading statements that violate FDA regulations. Specifically, the Second Amended Complaint suggests that vitaminwater violates FDA regulations by: (1) making health claims or implied nutrient-content claims despite the high amount of sugar in the product; (2) making health or certain implied nutrient content claims despite the fact that vitaminwater has been fortified with vitamins in violation of the FDA's fortification policy; and (3) prominently featuring the name of some, but not all, of its ingredients in its product name and label. As explained below, the first argument has been rejected by the FDA, but the latter two accurately describe violations of FDA regulations, and accordingly may serve as a non-preempted basis of state law liability.

      a.    *Use of Health or Implied Nutrient-Content Claims in Products with High Sugar Content*

      Congress has recognized that certain foods may be generally unhealthy, but nonetheless contain a nutrient that would, if considered alone, permit a health or nutritional content claim to be made about the product. In recognition of this fact, the FDCA authorizes regulations regarding "disqualifying nutrient levels;" that is, nutrient levels which would preclude any health claims from being made about that product. *See* 21 U.S.C.

343(r)(3)(A)(ii).[13]  In 1993 the FDA issued a final rule regulating the nutrients that could be

considered "disqualifying" for health-claim purposes, and identified only four such nutrients:

total fat, saturated fat, cholesterol, or sodium.  *See* 58 Fed. Reg. 2478, 2491 (Jan. 6, 1993); 21

C.F.R. §101.14(a)(4) (defining "disqualifying nutrient levels" as "the levels of total fat, saturated

fat, cholesterol, or sodium in a food above which the food will be disqualified from making a

health claim.").

   The FDA received several comments during the notice and comment period

proposing that sugar be included as a disqualifying nutrient.  *See* 58 Fed. Reg. at 2491.

However, it rejected these comments, determining that it "would not be appropriate to limit

health claims on foods on the basis of added sugars" because there was "no sound basis" for

doing so.  *Id.*  In particular, the FDA based its conclusion on the fact that "the public health

community has not identified a dietary level above which consumption of sugars has been

demonstrated to increase the risk of a disease," and the fact that no recommended Daily

Reference Value for sugar had been established.  *Id.*

   In 1994, the FDA considered the related question of whether a specified level of

sugar or calories should be a disqualifying nutrient for express or implied nutrient-content claims

identifying a product as "healthy."  Answering the question in the negative, the FDA concluded:

> The agency has not been persuaded by the comments that it is necessary to
> include a "low calorie" or "low sugar" criterion in the definition of "healthy" for
> the claim to be useful and not misleading to consumers.  The information
> provided in the comments did not show that consumers expect "healthy" to be a
> claim about the caloric content of the food.  Furthermore, the purpose of defining
> the term would be defeated if the term were defined so narrowly that it is
> appropriate only for people on weight-loss diets.  Thus, the agency is not

---

[13]  The statute does not explicitly use the term "disqualifying nutrient level"; that term is used in the
FDA's implementing regulations, which are found at 21 C.F.R. § 101.14(a)(4).

requiring that a food be "low calorie" or "low" in sugar to bear the term
"healthy."

59 Fed. Reg. 24232, 24244 (May 10, 1994).

As a matter of federal law, therefore, the presence of sugar is not a disqualifying nutrient which would prohibit the defendants from "touting the purported benefits" (Sec. Am. Compl. ¶ 3) of the other ingredients in their beverage, whether through health claims or express or implied claims of nutrient content. The FDA's decision to exclude sugar as a disqualifying ingredient is entitled to the same preemptive force as statutory law. *See Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Com'n of State of N.Y.*, 894 F.2d 571, 576 (2d Cir. 1990) ("Federal law need not be statutory to preempt state law. Regulations promulgated by an agency pursuant to its delegated authority may preempt similar state regulations." (citing *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984))). Accordingly, any claim under state law solely premised on the notion that vitaminwater's high sugar content made its health or implied nutrient content claims misleading is preempted by the FDA's express decision to not recognize sugar as a disqualifying nutrient.

   b.    *Use of Health or Implied Nutrient Content Claims of "Healthiness" in
         Products Fortified in Violation of FDA Fortification Policy*

Plaintiffs allege that it is misleading to market vitaminwater as a product which "may help consumers maintain healthy dietary practices" when it is an essentially "a snack food that has been fortified to provide the claimed nutritional benefits." Sec. Am. Compl. ¶ 57. *See also id.* at ¶ 4 ("it is just another flavored, sugary snack food like Coca-Cola, except that Defendants chose not to carbonate it."). This contention bears some similarity to the claim

18

discussed above but is distinct in contending that that the *fortification* of sugar water -- rather than the sugar content itself -- precludes defendants from claiming or implying that vitaminwater is a healthy beverage.

FDA regulations do not permit a health claim, or any nutrient content claim involving the word "healthy," (or any derivative) to be made about a food unless it contains, in the quantity customarily consumed at one sitting,[14] at least 10 percent of the recommended daily reference quantity[15] of vitamin A, vitamin C, calcium, iron, protein or fiber ("minimum nutrient levels"). *See* 21 C.F.R. § 101.14 (e)(6) (health claim); 21 C.F.R. § 101.65(d) (nutrient content claim). In the case of a claim that a product is "healthy," a manufacturer may fortify the product with nutrients in order to reach the required 10 percent nutrient threshold only if the addition of nutrients would be consistent with the FDA's fortification policy for foods set forth in 21 C.F.R. § 104.20, which bars the "indiscriminate addition of nutrients to foods."[16] *See* 21 C.F.R. §

---

[14] This reference quantity, termed "Reference Amount Customarily Consumed per Eating Occasion," is defined in the case of beverages such as vitaminwater in 21 C.F.R. § 101.12(b) as 8 fl oz (240 mL). It serves as a mandatory reference quantity for the purposes of calculating whether the 10% threshold has been met, but qualifies only as a recommended quantity for the purpose of setting serving sizes in the product label. *See id.* at n.5.

[15] These reference quantities encompass two sets of daily recommended nutrient intake values: (1) Reference Daily Intakes ("RDIs") for vitamins and minerals, and (2) Daily Reference Values ("DRVs") for macronutrients. The relevant RDI's are: 5,000 International Units of Vitamin A, 60 milligrams of Vitamin C, 1,000 milligrams of Calcium, and 18 milligrams of Iron. *See* 21 C.F.R. § 101.9(c)(8)(iv). The relevant DRV's are: 50 grams of protein and 25 grams of fiber. *See* 21 C.F.R. § 101.9(c)(9).

[16] The FDA Fortification Policy is itself non-binding but, as described above, is incorporated by reference into binding FDA regulations. As the FDA has explained:

> While it is true that the fortification policy is only a guideline, in the context of new § 101.54(e)(1) (ii), FDA has subjected the use of § 104.20 (21 C.F.R. 104.20) to notice and comment rulemaking. Interested persons were given notice that FDA intends to use that provision as more than a guideline. Such persons had an opportunity to object . . . . No comments did. Therefore, the fact that part 104 (21 CFR part 104) is generally intended to be used as a guideline has no significance here.

58 Fed. Reg. 2302, 2362. The defendants do not contend that the fortification policy is nonbinding.

101.65 (iv).  With regard to health claims, the food must contain the threshold 10 percent level of

nutrients "prior to any nutrient addition."  *See* 21 C.F.R. § 101.14(e)(6).  The FDA also does not

permit the use of the words "more," "fortified," "enriched," "added," "extra," or "plus" with

respect to a product containing added nutrients if the addition of the nutrients itself violates the

fortification policy in Section 104.20.  21 C.F.R. § 101.54(e).[17]

       The FDA regulations restricting health claims (or implied claims of "healthiness")

to foods which meet certain minimum nutrient levels, colloquially termed "the jelly bean rule,"[18]

were developed in order to prevent food producers from encouraging the consumption of "junk

foods" by fortifying them with nutrients.  As the FDA has explained:

> [I]n order to preclude the fortification of foods solely for the purpose of making a
> claim, the nutrient or nutrients must not be derived from fortification or other
> additions to the food.  Fortification of a food of little or no nutritional value for
> the sole purpose of qualifying that food for a health claim is misleading for
> several reasons.  There is great potential to confuse consumers if foods like
> sugars, soft drinks, and sweet desserts are fortified to qualify for a health claim
> when, at the same time, dietary guidance as contained in USDA's Food Guide
> Pyramid, for example, states that "[T]hese foods provide calories and little else
> nutritionally.  Most people should use them sparingly."  Indiscriminate
> fortification of such foods with one nutrient would not make such foods
> consistent with dietary guidelines.  Further, fortifying such foods is not consistent
> with FDA's fortification policy in § 104.20 that has been in effect for many years.
> The fundamental objective of FDA's policy on appropriate fortification of foods

---

[17]    On December 10, 2008, the FDA sent a warning letter to defendant Coca-Cola advising that the FDA considered its product Diet Coke Plus, a soft drink fortified with vitamins and minerals, to be misbranded.  The FDA's conclusion was based on the fact that Diet Coke Plus' use of the word "plus" violated 21 C.F.R. 101.54(e) because the addition of vitamins to "snack foods such as carbonated beverages" was contrary to the FDA's fortification policy.  *See* December 10, 2008 FDA Warning Letter to Coca Coca *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2008/ucm1048050.htm.  *See generally Diet Coke Plus Proves to Be a Minus With the FDA,* 16 No. 12 FDA Advertising and Promotion Manual Newsletter 11 (2009).

[18]    *See, e.g.,* Pauline M. Ippolito, *What Can We Learn From Food Advertising Policy Over the Last 25 Years?,* 12 Geo. Mason L. Rev. 939, 953 (2004) (explaining that the "'jelly bean rule' . . . is designed to ensure that an advertiser of jelly beans (or other sugar-based products) would not be able to make, for example, a heart disease claim under NLEA rules, even though the product is low in fat and saturated fat, and contains no cholesterol, and thus would meet all the other conditions for a heart-healthy claim.").

> is to establish a uniform set of principles that serve as a model for the rational
> addition of nutrients to foods.  In that policy, FDA clearly states its concern that
> random fortification of foods could result in deceptive or misleading claims for
> foods.

Final Rule, *Food Labeling: General Requirements for Health Claims for Food*, 58 Fed. Reg.

2478, 2522 (January 6, 1993) (citations omitted).  *See also Food Labeling: Nutrient Content*

*Claims, General Principles; Health Claims, General Requirements and Other Specific*

*Requirements for Individual Health Claims*, 60 Fed. Reg. 66206, 66212 (proposed Dec. 21,

1995) ("The agency is concerned, however, that eliminating the 10 percent nutrient contribution

requirement [would] permit misleading health claims on foods with little or no nutritional value

such as candies and soft drinks or will encourage overfortification of the food supply (e.g.,

vitamin or mineral addition to soft drinks).  The appearance of health claims on such foods

would be inconsistent with Congress's intent when it enacted the health claims provisions.").

> The "jelly bean rule" poses no bar to nutrient-content claims generally; it is
applicable only to (1) health claims; and (2) nutrient-content claims that use the word "healthy"
to suggest that a food because of its nutrient content may help consumers maintain healthy
dietary practices.  *See* 21 C.F.R. §§ 101.14 (e)(6); 101.65(d)(2).  Vitaminwater's labeling
contains claims in each of these two categories.[19]

---

[19]     Plaintiffs contend that the statements at issue are neither health claims nor implied nutrient content claims.  As a result, they further contend, their "claims are completely outside the scope of the coverage of the FDCA and are [therefore] not preempted."  *See* Pl. Br. at 6-7.  In particular, plaintiffs contend that the Second Amended Complaint does not identify any implied nutrient content claim because the quoted statements "do not suggest that vitamins or other nutrients are present *in a certain specific amount*."  Pl. Br. at 7 (emphasis in original).
          This argument fails because neither the FDCA nor the FDA's implementing regulations require that a statement identify a specific nutrient by name or quantity in order to qualify as an implied nutrient-content claim.  *See, e.g.*, 21 C.F.R. § 101.65(c)(3) ("a claim that a food contains oat bran is a claim that it is a good source of dietary fiber; that a food is made only with vegetable oil is a claim that it is low in saturated fat; and that a food contains no oil is a claim that it is fat free."); 58 Fed. Reg. 2302, 2371 (Jan. 6, 1993) (describing "contains corn oil" as implied nutrient content claim that the product is low in fatty acids); 21 C.F.R. § 101.54(f)(4) (describing "high in antioxidants" as nutrient-content claim.).  Defendants concede that vitaminwater's label contains at least some implied nutrient content claims.  *See* Def. Br. at 8.  In addition, as discussed *infra*, vitaminwater contains at least one

(i)      *"Healthy" Implied Nutrient-Content Claims*

The Second Amended Complaint identifies several statements allegedly made by defendants that constitute nutrient-content claims.  The label of "Rescue"-flavored vitaminwater, for instance, contains the statement that it is "specially formulated to support optimal metabolic function with antioxidants that may reduce the risk of chronic diseases and vitamins necessary for the generation and utilization of energy from food."  Because the statement  "suggest[s] that a food because of its nutrient content may help consumers maintain healthy dietary practices" in connection with an "implicit claim or statement about a nutrient," it constitutes a general nutritional claim (a type of nutrient-content claim) under 21 C.F.R. § 101.65(d).  Were this the sole nutrient-content claim, FDA regulations would not be violated, as the jelly-bean rule does not prohibit vitaminwater from making a nutrient content claim that does not use the word "healthy."  However, vitaminwater contains at least two implied nutrient claims that do contain the word "healthy":

> (1).  The statement on the "defense" flavor: "[I]f you've had to use sick days because you've actually been sick then you're seriously missing out, my friends. [S]ee, the trick is to stay *healthy* and use sick days to just um, not go in. [A]nd this combination of zinc and fortifying vitamins can help out with that and keep you *healthy* as a horse. [S]o drink up."

> (2).  The statement on the "B-Relaxed" flavor claiming that the product "is specially formulated with [B] vitamins and theanine.  The [B] vitamins are there to replace those lost during times of stress (physical or mental).  Theanine is an amino acid naturally found in tea leaves and has been shown to promote feelings of relaxation.  This combination can help bring about a *healthy* state of physical and mental being."

---

clear example of a health claim.

Sec. Am. Compl. ¶¶ 27-28 (emphasis added, alteration in original).[20]  Not every use of the word "healthy" on a food label conveys an implied nutrient content claim; a violation of 21 C.F.R. § 101.65(d)(2) occurs only where it is used in a context suggesting that a food will, because of its nutrient content, help consumers maintain healthy dietary practices.  *See* 59 Fed. Reg. 24232, 24235 (May 10, 1994).  Here, the description of the product as a "Nutrient-Enhanced Water Beverage," the statement "vitamins + water = all you need," and flavor names that are associated with specific purported health benefits may collectively imply that the product will assist consumers in maintaining healthy dietary practices.  By including the suggestion that the product will "keep you healthy" or "help bring about a healthy state of physical and mental being" alongside such statements, the quoted language implies that the nutrient content of vitaminwater may help consumers maintain healthy dietary practices.  I conclude, therefore, in light of the language and context in which they are used, that the statements on the "defense" and "B-Relaxed" labels constitute implied nutrient content claims which use the word "healthy."  Such claims are in violation of violation of FDA regulations because, as discussed below, vitaminwater achieves its nutritional content solely through fortification that violates FDA policy.

       (ii)    *Health Claim*

The label of vitaminwater's "focus" flavor states that it is "specially formulated to provide vitamin [A] (a nutrient known to be required for visual function), antioxidants and other nutrients [that] scientific evidence suggests may reduce the risk of age-related eye disease."

---

[20]     One additional implied nutrient-content claim containing the word "healthy" was included in the initial Complaint: VitaminWater's "multi-v," lemonade (vitamin a - zinc) flavor, was described as "specially formulated with 11 essential vitamins and minerals, from vitamin a to zinc, to provide the body with nutrients needed to remain healthy and active."  Compl. ¶ 18.

Sec. Am. Compl. ¶ 28 (alterations in original).  That statement "expressly or by implication . . .

characterizes the relationship of any substance to [the] disease or health-related condition," and

accordingly is a health claim.[21]  *See* 21 C.F.R. § 101.14(a)(1).  Because vitaminwater does not

meet the minimum nutritional requirements of 21 C.F.R. § 101.14(e)(6), any health claim about

the product is contrary to FDA regulation.  *Id.*

        (iii)     *FDA Fortification Policy*

        Defendants have failed to establish that the fortification of vitaminwater complies

with FDA fortification policy, which recognizes that "random fortification of foods could result

in over- or underfortification in consumer diets and create nutrient imbalances in the food

supply" and "could also result in deceptive or misleading claims for certain foods."  21 C.F.R. §

---

    [21]      Although defendants have not contended that the above claim constitutes a "structure/function" claim, a relatively unregulated category of claim that are commonly present on food labels, the language of the claim suggests that it may have been drafted with that understanding in mind.  As explained below, such a contention would have no merit.  The term "structure/function" refers to an exception arising out of the FDCA's definition of the term "drug."  Because the FDCA defines "drugs" as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease," but contains a limited exception for food products "intended to affect the structure or any function of the body," *see* 21 U.S.C. § 321(g)(1), food (and dietary supplement) labels may make claims about the effect a product has on the "structure or function" of the body without subjecting themselves to the heightened regulations applicable to health claims.  *See generally* Satine, 63 Food & Drug L.J. 537, 549 ("Because of the absence of regulation for food labeling structure/function claims, they have become one of the biggest loopholes in the regime designed to prevent misleading labeling."); Ilene Ringel Heller, *Functional Foods: Regulatory and Marketing Developments*, 56 Food & Drug L.J. 197, 206 (2001) (same); U.S. Gen. Accounting Office, *Food Safety: Improvements Needed in Overseeing the Safety of Dietary Supplements and "Functional Foods*,*"* at 18, 20 (2000) (noting that the FDA "has not clearly defined its standards for structure/function claims[,] . . . has taken no enforcement actions against questionable structure/function claims, and that "[w]hile NLEA requires FDA to rigorously review health claims before authorizing their use on product labels, there are no such requirements for structure/function claims") *available at* http://www.gao.gov/new.items/rc00156.pdf.  Although the border between structure/function claims and health claims is in some cases difficult to delineate, the claim on vitaminwater's focus flavor that it may "reduce the risk of age-related eye disease," does not present a close question: the product explicitly claims it can reduce the risk of a class of diseases and uses that very word.  *See* FDA Guidance for Industry: *Structure/Function Claims, Small Entity Compliance Guide*, Sec. D (January 9, 2002) (noting that claims using the word "disease" or "diseased" in connection with a reference to the product or its ingredients will generally exceed the bounds of the structure/function exception.), *available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/DietarySupplements/ucm103340.htm (last visited July 2, 2010).

104.20.[22]

   The FDA's fortification policy in 21 C.F.R. § 104.20 was enacted in 1980 and

largely mirrors the aims of the FDA's 1943 fortification policy.  The 1943 policy provided, *inter*

*alia*:

> Enrichment of foods with nutrients that are supplied in adequate quantities by the
> diets of all significant population groups is not only wasteful but tends to confuse
> consumers as to their nutritional needs. . . [such enrichment] tends to confuse and
> mislead consumers through giving rise to conflicting claims of nutritional values
> and by creating an exaggerated impression of the benefits to be derived from the
> consumption of such foods.

*Statement of Policy With Respect to the Addition of Nutritive Ingredients to Foods*, 8 Fed. Reg.

9170-02 (July 3, 1943).  *See generally* Institute of Medicine of the National Academies,

Committee on Use of Dietary Reference Intakes in Nutrition Labeling, *Dietary Reference*

*Intakes: Guiding Principles for Nutrition Labeling and Fortification* 49-51 (2003).[23]

   The current policy in 21 C.F.R. § 104.20 reflects the same essential principle as

the 1943 policy: fortification is not warranted absent some justification.  In particular, the current

policy states that "[t]he Food and Drug Administration does not encourage indiscriminate

addition of nutrients to foods, nor does it consider it appropriate to fortify fresh produce; meat,

poultry, or fish products; sugars; or snack foods such as candies and carbonated beverages," and

recommends fortification in only four circumstances:

  1. "[T]o correct a dietary insufficiency recognized by the scientific community. . ."

---

[22] Defendants' briefs discuss this issue only in passing.  Because federal preemption is ordinarily an
affirmative defense to a plaintiff's suit, it is defendants' burden to establish the prerequisites for preemption.  *See
Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987); *see also Williams v. Gerber Prods. Co.*, 552 F.3d 934,
937 (9th Cir. 2008) (declining to address untimely preemption defense).

[23] *Available at*
http://www.nal.usda.gov/fnic/DRI/DRI_Guiding_Principles_Labeling/guiding_principles_labeling_full_report.pdf.

2. "[T]o restore such nutrient(s) to a level(s) representative of the food prior to storage, handling and processing. . ."

3. "[I]n proportion to the total caloric content. . . to balance the vitamin, mineral, and protein content . . . ."

4. "to avoid nutritional inferiority" when replacing a traditional food.

21 C.F.R. § 104.20(b)-(e).  Defendants point out that vitaminwater is not carbonated, but do not contend that any of the four recommended bases for fortification are present.  Even assuming that the fortification of sugar water with vitamins was not itself a violation of the fortification policy, there is no basis on which to conclude that any of the four sanctioned bases for fortification is applicable.  The first two bases are on their face inapplicable because defendants do not allege that any relevant nutrient deficiency is present, or that any nutrients are lost in the production or the handling of the beverage.  The third basis for fortification relates to foods that are fortified to contain 21 specified nutrients.  *See* 21 C.F.R. § 104.20(d)(3).  Defendants have not contended that those 21 nutrients are present in vitaminwater.  Moreover, that provision contemplates the addition of nutrients to foods or beverages in specified, uniform quantities determined by reference to the caloric value of the product.  In contrast, the Second Amended Complaint suggests that defendants fortify various flavors of vitaminwater with differing levels of vitamins in accordance with the specific purported benefit claimed on the product's label.  *See* Sec. Am. Compl. ¶ 28.  The fourth basis for fortification is inapplicable because there is no basis on which to conclude that vitaminwater replaces a traditional food.

      c.     *Use of Product Name That Includes Some, But Not All Ingredients*

Plaintiffs allege that vitaminwater's labeling is misleading in that it uses a product name that includes of two of the product's ingredients (vitamins and water) but fails to mention

26

one other notable ingredient (sugar).  The FDA has recognized that such product names may

mislead consumers:

> The labeling of a food which contains two or more ingredients may be misleading
> by reason (among other reasons) of the designation of such food in such labeling
> by a name which includes or suggests the name of one or more but not all such
> ingredients, even though the names of all such ingredients are stated elsewhere in
> the labeling.

21 C.F.R. § 101.18(b).  The potential for confusion is heightened by the presence of other

statements in vitaminwater's labeling, such as the description of the product as a "vitamin

enhanced water beverage" and the phrases "vitamins + water = all you need" and

"vitamins+water = what's in your hand" which have the potential to reinforce a consumer's

mistaken belief that the product is comprised of only vitamins and water.  A state law cause of

action based on such statements is therefore not preempted by the FDCA.

   In sum, plaintiffs' allegations sufficiently state a claim that defendants have

violated FDA regulations by making health claims about vitaminwater even though it does not

meet required minimum nutritional thresholds, by using the word  "healthy" in implied nutrient

content claims even though vitaminwater's fortification does not comply with FDA policy, and

by using a product name that references only two of vitaminwater's ingredients, omitting the fact

that there is a key, unnamed ingredient in the product.  These claims are not preempted by the

FDCA because they seek to impose requirements on the defendants that are identical to those

imposed by the FDCA.

D. *Implied Preemption*

   Defendants contend that implied conflict preemption bars plaintiffs' state law

claims because those claims "pose[] an obstacle to the federal regulatory scheme with regard to

claims about food containing sugar." Def. Br. at 10.[24]  Because, as discussed above, I conclude

that express preemption bars any claim solely premised on the notion that vitaminwater's high

sugar content made its health or implied nutrient content claims misleading, it is not necessary to

consider whether implied preemption would also bar such a claim.  Plaintiffs' remaining claims

are premised on conduct that is violative of federal regulations, and therefore do not raise

implied conflict preemption concerns.[25]

E.       *Primary Jurisdiction*

Defendants contend that even if preemption does not bar plaintiffs' claims, the

plaintiffs' claims should be dismissed under the doctrine of primary jurisdiction.  I disagree.

As the Supreme Court explained in *United States v. Western Pacific Railroad Company*:

---

[24]       There is no dispute that implied field preemption is inapplicable.  *See* Transcript of Oral Argument on February 5, 2010 ("Tr.") at 8:3-13.  *See also Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028, 1032 (N.D. Cal. 2009) ("Congress has explicitly stated that it *does not* intend to occupy the field of food and beverage nutritional labeling; instead, it permits states to regulate subject matters covered by the NLEA and its regulations provided that such state laws do not fall within the FDCA's express preemption provisions) (emphasis in original); *Cipollone*, 505 U.S. at 532 ("We resort to principles of implied pre-emption – that is, inquiring whether Congress has occupied a particular field with the intent to supplant state law or whether state law actually conflicts with federal law – only when Congress has been silent with respect to pre-emption.") (Blackmun, J., concurring) (internal citation omitted).

[25]       Defendants contend in a footnote that plaintiffs' claims "implicate a federal interest embodied in the Dormant Commerce Clause" because "the burdens of additional labeling requirements would be clearly excessive in relation to the putative local benefits, if any, of telling the public something it already knows."  Def. Br. at 15 n.7 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).  Because plaintiffs' claims are premised on conduct that violates federal regulations, the Dormant Commerce Clause is not implicated.  Moreover, *Pike* is inapposite; that case concerned state legislation, enacted for the primary purpose of promoting and preserving the reputation of Arizona farmers, which would have had the incidental effect of forcing plaintiff, a grower of cantaloupes, to construct a packing plant in Arizona.  In concluding the burden imposed on interstate commerce exceeded the "minimal" interest of the state, the Court explicitly relied on the fact that the legislation did not concern the safety of food and was not designed to protect consumers from unfit goods.  *Id.* at 143-46.  In contrast, the legislation at issue here consists of state regulations that neither appear to be motivated by local protectionism nor have the effect of discriminating against out of state businesses in an area in which the states' regulatory interest is indisputable.  *See, e.g.*, *Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894) ("If there be any subject over which it would seem the states ought to have plenary control . . . it is the protection of the people against fraud and deception in the sale of food products.").  *See generally* 79 A.L.R. Fed. 246 *Validity, Under Commerce Clause (Art I, § 8, Cl 3), of State Statutes Regulating Labeling of Food* (2009).

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

352 U.S. 59, 63-64 (1956) (citing *Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 (1940)).  Dismissal on primary jurisdiction grounds "does not speak to the jurisdictional power of the federal courts," but rather "structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts."  *United States v. Bessemer & L.E.R. Co.*, 717 F.2d 593, 599 (D.C. Cir. 1983).  While "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," the Second Circuit has generally focused on four factors:

- whether the question at issue is within the conventional experience of judges or involves technical or policy considerations within the agency's particular field of expertise;

- whether the question at issue is particularly within the agency's discretion;

- whether there exists a substantial danger of inconsistent rulings; and

- whether a prior application to the agency has been made.

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006) (citing *Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.*, 46 F.3d 220, 222 (2d Cir. 1995)) (further citations omitted).  The question whether defendants have violated FDA regulations and marketed a product that could mislead a reasonable consumer is one courts are well-equipped to handle, and is not an appropriate basis

for invoking the primary jurisdiction doctrine. *See Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028 (N.D. Cal. 2009). In *Lockwood*, plaintiff consumers brought a putative class action under California's Unfair Competition Law, alleging that the defendant engaged in misleading conduct by advertising its pasta sauce as "all natural" when in fact it included high fructose corn syrup. In denying a motion to dismiss under the primary jurisdiction doctrine, the court observed that the FDA had already been asked to define the word natural, but it had declined to do so because it was not a priority in light of the limited resources possessed by the FDA. It found that "this is not a technical area in which the FDA has greater technical expertise than the courts -- every day courts decide whether conduct is misleading." *Id*. at 1035; *see also Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, No. 3:08-cv-1057-FLW, 2008 WL 5381227, at *4 (D.N.J. Dec. 17, 2008) (declining to dismiss on primary jurisdiction grounds and observing that "the case at bar [simply] requires this Court to determine whether Plaintiff and those similarly situated received what they bargained for."). That reasoning is applicable here as well: the FDA is aware of plaintiffs' concerns but lacks the resources to take enforcement action in every instance in which its policies are violated.[26] As in *Lockwood,* the ultimate issue is whether consumers could reasonably be misled by the violations, a question that courts are well-equipped to handle. Finally, deferral to the FDA is unlikely to result in a timely resolution of plaintiffs' claims. The FDCA does not provide a private right of action, and there is no reason to believe the plaintiffs could obtain a timely determination from the FDA concerning the merits of their claims. *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 60 (2d Cir. 1994)

---

[26]     The Center For Science In the Public Interest ("CSPI"), co-counsel for plaintiffs in this suit, sent a petition for proposed rulemaking to the FDA in 1999, seeking daily reference values and additional labeling for "added sugars" in soft drinks and other products, and seeking corresponding changes to nutrient-content and health-claim regulations. *See* Def. Br. at 10.

(noting, in considering issue of primary jurisdiction, that "[t]here clearly is a public interest in reasonably prompt adjudication").  *See also In re Farm Raised Salmon Cases*, No. B182901a, 2008 WL 2070612 (Cal. Ct. App. 2008) (rejecting dismissal on primary jurisdiction grounds because adequate administrative remedy is lacking under FDCA).

F.      *Pleading Standards of Fed. R. Civ. Pro. 8(a) and 9(b).*

1.      *Likelihood that Reasonable Consumers Would be Misled*

Because each claim includes the requirement that a reasonable consumer could have been misled by defendants' conduct, I address that common element first.  Viewing each allegedly misleading statement in light of its context on the label and in connection with the marketing of vitaminwater as a whole, I cannot conclude as a matter of law that a reasonable consumer could not be misled into believing that vitaminwater is a product that may help maintain healthy dietary practices and fail to appreciate that the product is not solely composed of vitamins and water.  The FDA has recognized that product names such as "vitaminwater" can be deceptive in that such names may mislead consumers into believing the listed ingredients are the sole components of a beverage.  *See* 21 C.F.R. § 101.18(b).  The potential for confusion by consumers is heightened by the presence of (1) claims in vitaminwater's labeling, such as "vitamins + water = all you need" or "vitamins + water = what's in your hand;[27] (2) the

---

[27]     Defendants contend that the phrase "vitamins + water = all you need" does not appear on the label of at least one flavor of vitaminwater, and that it is therefore "impossible for each [plaintiff] to have relied on a set of representations that included it."  *See* Def. Br. at 20 n. 11.  Such a fact is not contained in the Second Amended Complaint, and defendants provide no support for the quoted statement.  When matters outside the pleadings are presented in connection with a motion to dismiss for failure to state a claim, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material."  *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (internal quotation marks omitted).  Given the unsworn nature of the statement and the fact that no discovery has occurred, I decline to convert defendants' Rule 12(b)(6) motion into one for summary judgment and disregard defendants' assertion that the quoted language ("vitamins + water + all you need") does not appear on all flavors of vitaminwater.

31

description of the product as a "nutrient enhanced water beverage"; (3) the fact that several varieties of the product explicitly use the word "healthy" in connection with claims about vitaminwater's nutritional benefits; and (4) the inclusion of at least one health claim suggesting that a nutrient in vitaminwater may reduce the risk of a specific class of diseases.  The plaintiffs have sufficiently alleged that the collective effect of the challenged statements was to mislead a reasonable consumer into believing that vitaminwater is either composed solely of vitamins and water, or that it is a beneficial source of nutrients rather than a "food of little or no nutritional value [which has been fortified] for the sole purpose of" claiming or implying that it is "healthy." 58 Fed. Reg. 2478, 2522.[28]

In finding vitaminwater's marketing and labeling to be potentially misleading, I have given substantial weight to the FDA's determination that fortification of a food in a manner that is not consistent with FDA's fortification policy may be misleading because it may lead consumers to consume foods that contain sugar or other sources of calories, but lack any inherent nutrients other than those that have been added through fortification.  This conclusion  has been incorporated into binding regulations, *see* 21 C.F.R. §§ 101.54(e); 101.65 (iv); 101.14 (e)(6), and has been expressed in multiple contexts.  *See* 60 Fed. Reg. 66206, 66212 (noting that health claims on products that violate the FDA's fortification policy "would be misleading because consumers would be purchasing the food, in part, to achieve a more healthful diet, when, in fact, such foods are inconsistent with dietary guidelines.  Further, such claims could be damaging if

---

[28]     The Second Amended Complaint alleges that each plaintiff relied on the name "vitaminwater" and the statement "vitamins + water = all you need," but does not specifically allege which other statements, if any, each plaintiff relied on. Whether a consumer could reasonably have been misled by those phrases, even considered alone, cannot properly be decided on a motion to dismiss.  Accordingly, even assuming the Second Amended Complaint asserts no further basis for plaintiffs' potential confusion, dismissal would not be warranted.

consumers are encouraged to replace wholesome and nutritious foods that are recommended in dietary guidelines with these foods."); 58 Fed. Reg. 2478, 2521 ("the value of health claims should not be trivialized or compromised by their use on foods of little or no nutritional value. . . [or by] claims intended to promote the consumption of a food that is incompatible with dietary guidelines would be misleading to consumers."); *cf.* FDA Compliance Policy Guide *Fortification of Standardized Juices*, CPG Sec. 510.700 (May 13, 1988) ("It is therefore FDA's position that fortification of a food in a manner that is not consistent with FDA's fortification policy may be misleading.  If the act of fortification is misleading, it follows that a common or usual name that reflects that act is also misleading."), *available at*

*http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074434 .htm* (last visited July 2, 2010).

   Defendants contend that no reasonable consumer could have been misled by vitaminwater's labeling because: (1) the FDA-mandated label on each bottle bears the true facts about the amount of sugar per serving; (2) the allegations about brand names like "vitaminwater," the one-word flavor names like "rescue," slogans like "vitamins + water = all you need," and sayings like "healthy as a horse" describe only puffery; and (3) no reasonable consumer could believe that vitamins and water are literally "all they need to survive" or all that "is in your hand" when holding a bottle that disclosed the presence of sugar.

   The fact that the actual sugar content of vitaminwater was accurately stated in an FDA-mandated label on the product does not eliminate the possibility that reasonable consumers may be misled.  This issue was squarely addressed in a recent case applying California law, *Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008).  In *Gerber*, plaintiffs alleged that

the labeling of Gerber's "Fruit Juice Snacks" was misleading in that it, *inter alia*, portrayed the product as nutritious and depicted a number of different fruits, even though the product did not contain the juice of any pictured fruit and the two most prominent ingredients were corn syrup and sugar. The district court granted the defendants' motion to dismiss, crediting their contention that no reasonable consumer could have been misled by the product because that the ingredients were specifically identified on the FDA-mandated panel. On appeal, the Ninth Circuit reversed, holding that the mere fact that an FDA-mandated nutritional panel provided accurate nutritional information on a product did not bar claims that reasonable consumers could be misled. The court explained as follows:

> Reasonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box. . . . We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.

*Gerber*, 552 F.3d 934, 939-40. The same holds true here: the presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by vitaminwater's labeling and marketing.[29] Morever, even reasonable

---

[29]    The notion that the FDA-mandated nutritional facts would "cure" the potentially misleading impression that vitaminwater was a healthy beverage (rather than primarily sugar water) is further undermined by the characteristics of the label itself. For example, vitaminwater lists its sugar content and calorie total based on the assumption that one 20 ounce bottle contains 2.5 servings. This is consistent with FDA regulations, but the defendants could also have chosen to provide a "per bottle" calorie and sugar total. *See* 21 C.F.R. § 101.12(b) n.5; 21 C.F.R. § 101.9(b)(6) (Packages sold individually that contain 200% or more of the applicable reference amount may be labeled as a single serving if the entire contents of the package can reasonably be consumed at a single eating occasion). The FDA has recently considered changes to its policies regarding serving size designations. *See* Advance Notice of Proposed Rulemaking, *Food Labeling: Serving Sizes of Products That Can Reasonably Be Consumed At One Eating Occasion; Updating of Reference Amounts Customarily Consumed; Approaches for Recommending Smaller Portion Sizes*, 70 Fed. Reg. 17010, 17013 (2005) ("In general, focus group participants thought that having multiple servings listed on the label . . . was misleading and confusing."); *see also* Laura M. Tarantino, Acting Director, FDA Office of Nutritional Products, Labeling and Dietary Supplements, *Letter to Food*

consumers may not read the nutritional label prior to every purchase of a new product.  *See*

Lester M. Crawford, D.V.M., Ph.D., Acting Commissioner of the FDA, Remarks at the Harvard

Medical School 6th Postgraduate Nutrition Symposium (March 10, 2004) ("in survey after

survey, [only] 60%-80% of food shoppers said that they'd read the food label before buying a

new food."), *available at* http://www.fda.gov/NewsEvents/Speeches/ucm053591.htm (last

visited July 21, 2010) .

At oral argument defendants suggested that no consumer could reasonably be

misled into thinking vitaminwater was a healthy beverage or was composed only of vitamins and

water because the sweet taste of vitaminwater puts consumers on notice that the product contains

sugar.  Tr. 4:22- 5:17.  At least one court has adopted a similar theory.  *See McKinniss v.*

*General Mills, Inc.*, No. CV 07-2521 GAF, 2007 WL 4762172, at *3 (C.D. Cal. Sept. 18, 2007)

(stating, in dismissing suit which alleged "Berry Berry Kix" was misleadingly marketed as

containing fruit when it had none, that "a reasonable consumer would be expected to note, upon

pouring the contents of the packaging into a cereal bowl, that the product contained no actual

fruit.").  This argument fails at this stage of the proceedings for three reasons.  First, there is no

evidence before me concerning vitaminwater's taste.[30]  Second, even assuming *arguendo* that I

_____

*Manufacturers about Accurate Serving Size Declaration on Food Products* (March 12, 2004) (encouraging
manufacturers to label food packages as single-serving where entire contents of a package can reasonably be
consumed at a single-eating occasion), *available at*
http://www.fda.gov/Food/LabelingNutrition/FoodLabelingGuidanceRegulatoryInformation/InspectionCompliance/
WarningOtherLetters/ucm110234.htm; *see generally* William Neuman, *One Bowl = 2 Servings. F.D.A. May Fix
That,* N.Y. Times, Feb. 5, 2010 (quoting current and former FDA officials and noting that FDA is considering update
to misleading labeling regarding serving sizes).

[30]    Defendants appear to suggest the court could take judicial notice that vitaminwater tastes sweet
because it is "common sense. . . that [in] anything that's packed or loaded with sugar, as the plaintiffs allege here,
you can taste the presence of sugar."  Tr. 5:6-9.  I do not consider that assertion to be a fact "not subject to
reasonable dispute" as required by Federal Rule of Evidence 201.  Numerous products, such as ketchup (for
instance) contain added sugar but are not necessarily considered sweet.  *See* 21 C.F.R. § 155.194(a)(2)(ii)
(specifying that a product identified as "ketchup" "catsup" "catchup" must contain sweeteners).

could take judicial notice that vitaminwater tastes sweet, a reasonable consumer might believe it had been sweetened by something other than sugar.  Finally, as plaintiffs noted at oral argument, adopting such a rule would essentially insulate defendants from liability so long as consumers were only deceived once by a product; a notion contrary to the consumer protection laws of New York, New Jersey and California.  Tr. 15:13-18.

   As for the defendants' argument that the statements at issue are nothing more than puffery, the statements are not merely exaggerated claims of quality or "[s]ubjective claims about products, which cannot be proven either true or false."  *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (citations omitted).  Rather, they describe the contents of a food product in ways consumers might reasonably rely on in choosing to purchase vitaminwater.  Further, consumers who have some awareness that food product labeling is subject to government regulation (owing in part to the ubiquitousness of the FDA's "nutrition facts" label on food products) may reasonably be expected to rely on label claims as accurate depictions of a food's contents and nutritional value.  As a New Jersey court observed in another context: "it seems clear that such an impression was precisely what defendant intended to convey.  If that were not the case, it is difficult to understand what defendant had in mind."  *Miller v. Am. Family Publishers*, 284 N.J. Super. 67, 80 (Super. Ct. Ch. Div. 1995).  Accordingly, I cannot conclude as a matter of law that the statements could not have been reasonably relied on by consumers.  *See e.g.*, *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super. 617, 645 (App. Div. 2002) (concluding that "[w]hether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact."); *see also Williams v. Gerber Products Co.*, 552 F.3d at 938-39

36

("whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides'" and therefore usually cannot be resolved through a motion to dismiss) (citation omitted).

2.    California State Law Claims

a.    *Applicability of Federal Rule of Civil Procedure 9(b)*

Claims under California's Unfair Competition Law or False Advertising Law do not include fraud as an element, and therefore generally do not need to be pled with particularity. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  Nonetheless, such claims may be subject to Rule 9(b) if the claims are premised on allegations of fraud.  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Defendants argue that Rule 9(b) should apply to all of plaintiffs' California claims because the complaint is "fundamentally grounded in fraud or based on common law fraud elements."  Def. Reply Br. at 6 (quotation marks omitted).  Because, as further discussed below, I conclude that plaintiffs have pled each of their California state law claims with sufficient particularity to satisfy Rule 9(b), I do not address whether the Second Amended Complaint is "grounded in fraud" to a degree which would subject each of plaintiffs' California state law claims to that heightened pleading standard.[31]

---

[31]    Both parties rely heavily on Ninth Circuit cases regarding the applicability of Rule 9(b)'s heightened pleading standard to plaintiffs' California state law claims.  Ninth Circuit law does not bind this court with respect to the application of Rule 9(b) in this case.  There is no dispute that, as a matter of California state law, plaintiffs California claims do *not* contain fraud as an element.  Whether plaintiffs' claims must comply with the pleading burdens imposed by Fed. R. Civ. P. 9(b) by virtue of the complaint "sounding in fraud" or being "grounded in fraud" is an issue of federal law, not state law.  *See Northwestern Mut. Life Ins. Co. v. Banc of Am. Sec. LLC*, 254 F. Supp. 2d 390, 396 (S.D.N.Y. 2003) (concluding that "[t]his Court is required to follow the precedent of the Court of Appeals for the Second Circuit with respect to the interpretation and application of Rule 9(b)," regardless of which state's law governs the underlying claim); *see also Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 91 (2d Cir. 2006); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003) (same).  In any event, my conclusion that plaintiffs' California claims satisfy Rule 9(b) disposes of this issue.

b.  *Unlawful Business Practices and False Advertising (Claims 1, 4 and 5)*[32]

Plaintiffs allege that defendants are liable for violating California's UCL through unlawful business practices, unfair business practices, and fraudulent business practices. Because the UCL prohibits "unfair competition," which it broadly defines as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," Cal. Bus. & Prof. Code § 17200, "it is violated where a defendant's act or practice is (1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation of section 17500 (false or misleading advertisements)."  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).  In addition, violations of California's False Advertising Law constitute "unlawful" conduct for the purposes of the UCL.  *See Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 210 (Cal. 1983) ("[a]ny violation of the false advertising law . . . necessarily violates the unfair competition law"), *superseded by statute on another ground*, *as stated in Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227 (2006); *see also Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (Cal. 2002) (noting that the Cal. Bus. & Prof. Code § 17200 defines unfair competition to include any act prohibited by California's False Advertising Law).  Accordingly I consider plaintiffs' UCL "unlawful conduct" claim by analyzing whether plaintiffs have adequately pleaded a violation of California's False Advertising Law.[33]

California's False Advertising Law prohibits the dissemination in any advertising

---

[32]  Plaintiffs separately allege claims under California's Business & Professions Code § 17500 *et seq.* for "false advertising" and "untrue advertising."  Neither party has attempted to distinguish these two claims, and they are addressed as one here.

[33]  Plaintiffs contend in the alternative that defendants have violated the "unlawful conduct" prong of the UCL through violations of California's Sherman law.  *See* Sec. Am. Compl. ¶ 61. Because I find that plaintiffs have adequately pled a violation of the "unlawful conduct" prong through violations of California's FAL, I do not address this alternative contention.

medium of any "statement" concerning real or personal property offered for sale, "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."  Cal. Bus. & Prof. Code § 17500.  A claim under the FAL may be based "not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."  *Kasky*, 27 Cal. 4th at 951 (citations omitted).  Accordingly, "a plaintiff must allege: (1) statements in the advertising are untrue or misleading, and (2) defendant knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading." *VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F. Supp. 2d 1073, 1086 (E.D. Cal. 2009) (citation omitted).

Defendants contend that plaintiffs have not adequately pled reliance or injury under the UCL.  I disagree.

The UCL previously authorized "any person acting for the interests of itself [sic], its members or the general public" (former § 17204) to file an action for relief; standing to bring such an action did not depend on a showing of injury or damage.  In the November 2, 2004 General Election, California voters approved Proposition 64, which imposed restrictions on a private individual's right to sue under the UCL or False Advertising law to those individuals who have "suffered injury in fact and ha[ve] lost money or property as a result of such unfair competition."  *Californians for Disability Rights*, 39 Cal. 4th at 227; *see also* Cal. Bus. & Prof. Code  §§ 17203-04 (UCL), 17535 (FAL).  Accordingly, the UCL and FAL now contain a reliance requirement.  As the California Supreme Court explained in a recent case discussing the post-Proposition 64 standing requirements for a UCL fraud case:

> [T]here must be some connection between the injury and the defendant's conduct.
> . . . while a plaintiff must allege that the defendant's misrepresentations were an
> immediate cause of the injury-causing conduct, the plaintiff is not required to
> allege that those misrepresentations were the sole or even the decisive cause of
> the injury-producing conduct.

*In re Tobacco II Cases*, 46 Cal. 4th 298, 325-29 (Cal. 2009).  *See also Laster v. T-Mobile USA,*

*Inc.*, No. 05cv1167, 2009 WL 4842801, at *5 n.1 (S.D. Cal. Dec. 14, 2009) (applying the

reliance requirement stated in *In re Tobacco II* to non-fraud UCL claim).

Plaintiffs' Second Amended Complaint identifies numerous specific statements

alleged to be misleading, and alleges that those statements create "the central message. . . that

VitaminWater is not a sugary soft drink. . . . [However] this message is false, misleading,

deceptive, and unfair.  Vitaminwater is not a beneficial fortified drink – it is just another

flavored, sugary snack food like Coca-Cola, except that Defendants chose not to carbonate it."

*Id.* at ¶ 4.  The Second Amended Complaint further alleges that:

> Each plaintiff relied on Defendants' false, misleading, and deceptive written
> misrepresentations that VitaminWater is a beneficial dietary supplement beverage
> including, but not limited to, "vitamins + water = all you need" and the name of
> the product itself - "VitaminWater" in deciding to purchase vitaminwater.  Had
> Plaintiffs known the truth that the statements they relied on were false,
> misleading, deceptive, and unfair, they would have neither purchased
> VitaminWater nor paid the premium price Defendants charged for it.

Sec. Am. Compl. ¶ 16.  Such allegations adequately plead reliance for the purposes of the UCL.

California courts have liberally construed the requirements for pleading reliance in cases in

which it would be impractical to expect a plaintiff to recall with specificity each statement that

he or she considered prior to making a purchase.  *See In re Tobacco II Cases* at 329 ("[W]here,

as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not

required to plead with an unrealistic degree of specificity that the plaintiff relied on particular

40

advertisements or statements."); *see also Morgan v. AT&T Wireless Servs., Inc*., 177 Cal. App. 4th 1235, 1262 (Cal. Ct. App. 2009) ("plaintiffs need not allege the specific advertisements the individual plaintiffs relied upon; it is sufficient for the plaintiff to provide a representative selection of the advertisements or other statements to indicate the language upon which the implied misrepresentations are based."); *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1045 (N.D. Cal. 2010) (element of reliance satisfied by complaint that "roughly" identified representations relied on).

Plaintiffs have also adequately pled injury.  California courts have held that a plaintiff who fails to receive the benefit bargained for because of a misrepresentation made by a defendant suffers sufficient injury to state a claim under the UCL.  *See, e.g.*, *Koh v. S.C. Johnson & Son, Inc.*, No. C-09-00927 (RMW), 2010 WL 94265, at *2 (N.D. Cal. Jan. 6, 2010) (complaint adequately alleged injury under UCL through claims that plaintiff bought the product at a premium price in reliance on misleading suggestion that it was environmentally friendly); *Chavez v. Blue Sky Natural Beverage Co.*, 340 Fed. Appx. 359 (9th Cir. 2009) (injury sufficiently pled where plaintiff purchased product because of misrepresentation that it was from New Mexico); *see also Lozano*, 504 F.3d at 734  (plaintiff "has properly stated an injury that he did not receive the full value of his contract with [defendant]" due to its alleged failure to disclose certain facts about its billing practices).  Accordingly, the allegations in the Second Amended Complaint adequately allege a violation of California's FAL (§ 17500 *et seq*.), and in turn, California's UCL (§ 17200 *et seq*).

      c.    *Unfair Business Practices (Claim 2)*

A business practice is "unfair" for the purposes of a claim under the UCL when it

"offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[34] *Wilner v. Sunset Life Ins. Co.*, 78 Cal. App. 4th 952, 965 (Ct. App. 2000) (citing *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1104 (Sup. Ct. 1996)). "The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.* To prevail, a plaintiff must establish that "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006). California state courts have indicated that a plaintiff may make out a prima facie case of unfair conduct by alleging wrongful conduct on the part of the defendant; the plaintiff needn't speculate at the pleading stage as to the defendant's

---

[34]      Neither party discusses the elements of a claim of unfair competition under California law, an issue that remains somewhat unsettled in light of the California Supreme Court's decision in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548 (1999). *Cel-Tech* rejected the use of "amorphous" definitions of "unfair" (such as the definition in *Wilner, supra*) and held that a claim of unfair business practices requires "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech* at 184-85. However, in a footnote, the court explicitly limited its holding to cases filed by business competitors, as opposed to consumers. *Id.* at 187 n.12. Subsequent cases have not been uniform in their assessment of whether *Cel-Tech* altered the analysis of a claim of Unfair Business Practices in claims brought by consumers. The better view appears to be that *Cel-Tech* standard is inapplicable in a consumer action, in view of the fact that (1) the opinion's reference to antitrust law is sensible in a suit alleging anti-competitive conduct, but makes little sense in a consumer action; and (2) a contrary view would render *Cel-Tech*'s footnote 12 meaningless. That position is supported by case law in the Ninth Circuit. *See, e.g.*, *Lippitt v. Raymond James Financial Services, Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (citing pre-*Cel-Tech* analysis in consumer UCL case); *Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1075 (C.D. Cal. 2003) ("The test annunciated in *Cel-Tech*, however, applies only to cases between direct competitors"); *see also Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal. App. 4th 700, 720, n.23 (2001) ("we are not to read *Cel-Tech* as suggesting that such a restrictive definition of 'unfair' should be applied in the case of an alleged consumer injury"); *but see Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (Cal. Super. Ct. 2003) (contra).

countervailing interests.  *See Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980) ("[S]ince the complaint is unlikely to reveal defendant's justification, if th[e] pleading states a prima facie case of harm, . . . the defendant should be made to present its side of the story.").

Defendants have not raised any basis for dismissing plaintiffs claim based on the "unfair" prong of the UCL other than those already rejected in connection with the discussion of plaintiffs' claims under the "unlawful" prong of the UCL.

        d.      *UCL Fraud (Claim 3)*

Plaintiffs' third claim states a claim for fraudulent business practices under the UCL.  Aside from the use of the term "fraud," a claim for fraudulent business practices under the UCL has little in common with the elements of common law fraud.  "A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages.  None of these elements are required to state a claim for injunctive relief under the UCL."  *In re Tobacco II Cases*, 46 Cal. 4th at 312 (citation and quotation marks omitted).  *See also Capitol Records, Inc. v. MP3tunes, LLC*, 611 F. Supp. 2d 342 (S.D.N.Y. 2009) ("Fraudulent as used in § 17200 does not refer to the common law tort of fraud but only requires a showing members of the public are likely to be deceived." (citing *Express, LLC v. Fetish Group, Inc.*, 464 F. Supp. 2d 965, 980 (C.D. Cal. 2006))).  To prevail, a plaintiff "must produce evidence showing 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'"  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025-26 (9th Cir. 2008) (citations omitted).

Courts have not been consistent regarding whether a UCL fraud claim must be

pled with particularity.  The California Supreme Court has held that the heightened pleading

requirements generally applicable to fraud claims do not apply to a claim for "fraudulent"

business practices under the UCL because the latter requires only that plaintiffs establish that

members of the public are likely to be deceived, and contains no scienter requirement.  *See, e.g.*,

*Comm. on Children's Television*, 35 Cal. 3d at 212 n.11 ("The requirement that fraud be pleaded

with specificity. . . does not apply to causes of action under the [UCL]"); *Morgan*, 177 Cal. App.

4th at 1256 (same); *see also StreamCast Networks, Inc. v. IBIS LLC*, No. CV 05-04239 (MMM),

2006 WL 5720345, at *11 (C.D. Cal. May 2, 2006) ("To prevail on a claim that a business

practice is fraudulent under § 17200, "[i]t is not necessary to show that the defendant intended to

injure anyone.") (citation omitted).  However, a number of recent cases from the Ninth Circuit

and California district courts have held that claims of fraudulent business practices under the

UCL are subject to Rule 9(b)'s heightened pleading requirements where the claim is "grounded

in fraud."  *See, e.g.*, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *see also*

*Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081 (N.D. Cal. 2007).  Even

assuming plaintiffs' claims are subject to Rule 9(b), I conclude that they have met that standard.

Defendants contend that plaintiffs have not pled their claims with particularity

because they have not identified which statements in vitaminwater's labeling were relied on by

each individual plaintiff.  Such a detailed complaint would be helpful, but it is not required by

Fed. R. Civ. Pro. 9(b).[35]  To satisfy the pleading requirements of Rule 9(b), a complaint must

---

[35]        California law also does not require such specificity.  As California courts have recognized:
"[w]hen an unfair-competition claim is based on an alleged fraudulent business practice -- that is, a practice likely to
deceive a reasonable consumer -- 'a plaintiff need not plead the exact language of every deceptive statement; it is
sufficient for [the] plaintiff to describe a scheme to mislead customers, and allege that each misrepresentation to each
customer conforms to that scheme."  *Linear Tech. Corp. v. Applied Materials, Inc*., 152 Cal. App. 4th 115, 135 (Cal.
Ct. App. 2007) (citation omitted).

"(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1128 (2d Cir. 1994).  Here plaintiffs have alleged that each plaintiff relied on at least two specific misleading statements (the name vitaminwater and the statement "vitamins + water = all you need"); explicitly identified a number of other statements made in vitaminwater's labeling which are alleged to have created that misleading impression, and identified the basis for plaintiffs' belief that the statements are deceptive.  The California plaintiffs have identified the general locations where they purchased vitaminwater, the frequency with which they purchased vitaminwater, and (with the exception of plaintiff Ruslan Antonov) the specific flavors they purchased.  *See* Sec. Am. Compl. ¶¶ 9, 10.  Accordingly, the allegations underlying plaintiffs' California state law claims meet Rule 9(b)'s essential requirements of "provid[ing] a defendant with fair notice of a plaintiff's claim . . . safeguard[ing] a defendant's reputation from improvident charges of wrongdoing, and [] protect[ing] a defendant against the institution of a strike suit." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (citing *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).

> e.   *Unfair Methods of Competition or Unfair or Fraudulent Acts or Practices in Violation of § 1770(a)(7) of the CLRA (Claim 6)*

California's CLRA, Cal. Civ. Code § 1750 *et seq.*, prohibits specified "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale or lease of goods or services to a consumer.  *See* Civ. Code, § 1770(a).  Among the practices prohibited by the CLRA is "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have" and

45

"[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Civ. Code, §§ 1770(a)(5) & (a)(7).[36] Civil Code section 1760 states that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Neither party has attempted to distinguish plaintiffs' CLRA claims from the UCL claims discussed above.  Interpreting the CLRA liberally in accordance with its language, I conclude that defendants have adequately pled a violation of the CLRA through the same allegations that satisfy their claims under the UCL and FAL.[37]

       3.       *New York State Law Claims*

           a.       *Gen. Bus. Law. §§ 349 & 350 (Claim 7 & 8)*

"In order to show that Plaintiff is entitled to relief for a violation of New York General Business Law ("GBL") § 349, relating to deceptive business practices, or § 350, relating to false advertising, a plaintiff must show: (1) that the act, practice, or advertisement was consumer-oriented; (2) that the act, practice, or advertisement was misleading in a material respect, and (3) that the plaintiff was thereby injured.  *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) (§ 349); *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 287 (E.D.N.Y. 2009) (§ 350) (citation omitted).  The standard for whether an act or practice is misleading is an objective one, requiring a showing that a reasonable consumer would have been misled by the defendant's

---

[36]      The Second Amended Complaint cites only Cal. Civ. Code § 1770(a)(7).

[37]      Pursuant to Civil Code section 1782, prior to a suit for damages under the CLRA, a plaintiff must notify the defendant of the alleged violation and allow the defendant an opportunity to remedy it.  There is no dispute that this prerequisite has been met.

conduct.  *Marcus v. AT&T*, 138 F.3d 46, 64 (2d Cir. 1998); *Oswego Laborers' Local 214*

*Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (N.Y. 1995)); *but see Flattau v. John*

*Hancock Mut. Life Ins. Co.*, No. 85 Civ. 5487 (JFK), 1986 WL 14977, at *3 (S.D.N.Y. Dec 12,

1986) (suggesting that courts should "not look to the average customer but to the vast multitude

which the statutes were enacted to safeguard--including the ignorant, the unthinking and the

credulous who, in making purchases, do not stop to analyze but are governed by appearances and

general impressions.") (citation omitted).  Claims under GBL §§ 349 and 350 are not subject to

the pleading-with-particularity requirements of Fed. R. Civ. P. 9(b).  *See Pelman ex rel. Pelman*

*v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (GBL § 349); *United Magazine Co. v.*

*Murdoch Magazines Distrib., Inc.*, No. 00 Civ. 3367, 2001 WL 1607039, at *12 (S.D.N.Y. Dec.

17, 2001) (GBL § 350).  To prevail on a claim under GBL § 350, a plaintiff must demonstrate

reliance on defendants' false advertising.  However § 349 does not require proof of reliance.  *See*

*Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005); *see also Stutman v. Chem. Bank*, 95

N.Y. 2d 24, 29 (2000) ("[A]s we have repeatedly stated, reliance is not an element of a section

349 claim.").

        Defendants contend that plaintiffs have failed to adequately plead claims under

GBL sections 349 and 350 because they have not adequately alleged reliance or injury.  Neither

contention is persuasive.  As noted above, reliance is not an element of a § 349 claim.

Moreover, plaintiffs have adequately pled the reliance element of a claim under § 350 through

the same allegations discussed above in connection with plaintiffs' California UCL claims.  *See*

*Pelman*, 396 F.3d at 512 (if plaintiffs' allegation of a generalized campaign to create a false

impression is vague, "the cure for such deficiencies, in a claim not required to be plead with

particularity, is a motion for a more definite statement under Rule 12(e), Fed. R. Civ. P., rather

than dismissal") (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514-15 (2002)).

Injury is adequately alleged under GBL §§ 349 or 350 by a claim that a plaintiff

paid a premium for a product based on defendants' inaccurate representations. *See Jernow v.

Wendy's Intern., Inc.*, No. 07 Civ. 3971 (LTS) (THK), 2007 WL 4116241, at *3 (S.D.N.Y. Nov.

15, 2007) (citing *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (N.Y. 2002)).

Defendants' contention that *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43 (N.Y. 1999),

compels a contrary conclusion is unpersuasive.  In *Lorillard*, plaintiffs sued a number of tobacco

companies, alleging that they had used deceptive commercial practices to sell their cigarettes to

New Yorkers.  Plaintiffs contended that their injury consisted of the fact that they had bought a

product they otherwise would not have purchased and had become addicted to nicotine as a

result of defendants' deceptive conduct.  The Appellate Division, First Department, rejected

plaintiffs' theory that the mere purchase of the product was sufficient to establish injury, holding

that: "[i]f plaintiffs do not prove addiction, they cannot show that they were harmed."  *Small v.

Lorillard Tobacco Co.*, 252 A.D.2d 1, 7 (N.Y. App. Div. 1998).  On plaintiffs' appeal to the New

York Court of Appeals, the New York Attorney General submitted an amicus brief supporting

plaintiffs' theory of injury and arguing that "[t]he Appellate Division's holding, by removing a

fundamental category of consumer injury from being actionable under § 349, threatens to

severely undermine the statute's utility to injured consumers."  Amicus Curiae Brief of the New

York State Attorney General, 1999 WL 33660064, at *7 (Aug. 30, 1999).  Agreeing, the Court

of Appeals observed: "[t]he Attorney General may be right that a plaintiff might have a claim"

where a consumer paid a higher price for a product as the result of a misrepresentation, such as

in a case "where a distributor asserts that its bottled water is from a pure and pristine mountain stream while in reality, it was only tap water." *Small v. Lorillard Tobacco Co., Inc*., 94 N.Y.2d 43, 56 n.5 (N.Y. 1999). Though the court concluded that dismissal was warranted because the plaintiffs had failed to allege that that the cost of cigarettes was affected by defendants' alleged misrepresentation, *id.* at 56, plaintiffs here explicitly allege that "[d]efendants command a premium price for vitaminwater by distinguishing it from soft drinks (including their own), and by marketing and advertising it as a fortified beverage, a dietary supplement in liquid form." Sec. Am. Compl. ¶ 5. Accordingly, I conclude that plaintiffs' allegations of misleading marketing and labeling have adequately stated a claim under GBL §§ 349 and 350.

### 4. *New Jersey State Law Claims*

#### a. *N.J. Consumer Fraud Act, N.J.S.A. 56:8-1 (Claim 9)*

A party asserting a claim under New Jersey's Consumer Fraud Act ("NJCFA") must establish (1) wrongful conduct; (2) an ascertainable loss; and (3) and a causal relationship or nexus between the wrongful conduct and the loss. *See Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc*., 192 N.J. 372, 389 (N.J. 2007).[38] The New Jersey Supreme Court has explained that the requirement of ascertainable loss in the NJCFA replaces the traditional reliance requirement of a common law tort claim. *See id.* Plaintiffs' NJCFA claims are based on allegations that defendants both affirmatively misrepresented and intentionally omitted material facts with intent to cause consumers to purchase vitaminwater.

---

[38] Defendants have not contended that plaintiffs' NJCFA claims would be preempted or "subsumed" by the Products Liability Act ("PLA"), N.J.S.A. 2A:58C-1 *et seq.* (1987), and this opinion therefore does not address whether such a defense would have merit under New Jersey law. *See, e.g.*, *Vercellono v. Gerber Products Co.*, No. 09-CV-2350 (DMC), 2010 WL 455388, at *6 (D.N.J. 2010) (dismissing CLA claim as preempted by PLA).

*See* Sec. Am. Compl. ¶ 125.  The heightened pleading standards of Rule 9(b) are therefore

applicable to plaintiffs' claims under the NJCFA.  *See Frederico v. Home Depot*, 57 F.3d 188,

202 (3d Cir. 2007).

Plaintiffs fail to plead their claims under New Jersey law with the requisite

particularity.  The Second Circuit has held that "[A] plaintiff should specify the time, place,

speaker, and content of the alleged misrepresentations."  *Luce v. Edelstein*, 802 F.2d 49, 54 (2d

Cir. 1986).  In contrast to the detail in the Second Amended Complaint regarding the California

claims, the Second Amended Complaint contains no information regarding: (1) when or how

often during the class period the New Jersey plaintiffs purchased vitaminwater; (2) where they

purchased vitaminwater, or whether any purchases occurred within the state of New Jersey; (3)

what variety of vitaminwater they purchased.  While Rule 9(b) is not designed to "require the

impossible," and a plaintiff does not necessarily need to specify the precise time or date on

which each allegedly misleading statements was made, *see, e.g.*, *Pollack v. Laidlaw Holdings,*

*Inc.*,

No. 90 Civ. 5788 (DLC), 1995 WL 261518, at *9 (S.D.N.Y. May 3, 1995), the New Jersey state

law claims are devoid of all but the most bare facts regarding plaintiffs' purchase of

vitaminwater.  Such allegations are insufficient to withstand Rule 9(b) scrutiny.

5.      *Breach of Warranty Under NY, NJ and CA Law (Claims 10 & 11)*

The Second Amended Complaint alleges that defendants breached express and

implied warranties that vitaminwater was "beneficial and had particular beneficial characteristics

as set forth above."  Sec. Am. Compl. ¶¶ 128, 132.  The Supreme Court has held that breach of

warranty claims do not impose an additional "requirement" under state law, because the duty to

50

honor a promise voluntarily undertaken "[can] not fairly be said to be 'imposed under state law,'
but rather is best understood as undertaken by the manufacturer itself," and are therefore not
preempted. *Cipollone*, 505 U.S. 526. Nonetheless, plaintiffs have failed to plead a claim for
violation of an express warranty. The Second Amended Complaint states that "Defendants
provided Plaintiffs and other members of the Class with written and express warranties,
including, but not limited to, warranties that their vitaminwater beverages were beneficial and
had particular beneficial characteristics as set forth above." Plaintiffs do not allege that any
bottle of vitaminwater contains the word "beneficial," do not state which words they allege to
have created an express warranty, and do not clarify what is referred to by the words "as set forth
above." Such conclusory language fails to "give the defendant fair notice of what the . . . claim
is and the grounds upon which it rests" and does not adequately plead a claim for breach of an
express warranty under state law. *Twombly*, 550 U.S. at 555 (citation omitted). *See, e.g.*, *Lake
v. Kardjian*, 874 N.Y.S.2d 751, 755 (N.Y. Sup. Ct. 2008) (finding plaintiff "has not identified
any specific statements by [defendant] which would constitute an express warranty, and has
thereby failed to establish the existence of a claim which would escape federal preemption and
survive this motion to dismiss.")); *Simmons v. Stryker Corp.*, No. 08-3451 (JAP), 2008 WL
4936982, at *2 (D.N.J. Nov. 17, 2008) (dismissing express warranty claim where plaintiff did
not identify source of warranty); *Blennis v. Hewlett-Packard Co.*, No. C 07-00333 JF, 2008 WL
818526 (N.D. Cal. Mar. 25, 2008) (same).

Plaintiffs' claim for breach of an implied warranty of merchantability fails as well.[39]   The law of all three states is similarly based on the Uniform Commercial Code ("UCC").   *See* Cal. Com. Code § 2314; N.J. Stats. § 12A:2-314; N.Y. U.C.C. § 2-314.   Under the UCC, if a seller is a merchant, there is an implied contract that the goods will be of merchantable quality.   *See Denny v. Ford Motor Co.*, 87 N.Y.2d 248 (N.Y. 1995) (citing section 2-314(2)(c) of the UCC).   A warranty of merchantability, however, "does not mean that the product will fulfill a "buyer's every expectation" but rather simply "provides for a minimum level of quality."   *Viscusi v. Proctor & Gamble*, No. 05-CV-01528 (DLI)(LB), 2007 WL 2071546, at *13 (E.D.N.Y. July 16, 2007) (citing *Denny*, 87 N.Y.2d at 259).   *See also Sugawara v. Pepsico, Inc.*, No. 2:08-cv-01335-MCE-JFM, 2009 WL 1439115, at *5 (E.D. Cal. 2009) (same) (citations omitted); *see generally* 18 Williston on Contracts § 52:76 (4th ed. 2009) (equating "merchantable" quality with "fitness for human use or consumption.").   Even crediting each of the allegations of the complaint, plaintiffs cannot establish that vitaminwater failed to constitute a merchantable product.

6.   *Common Law Deceit/Misrepresentation Under NY, NJ and CA Law (Claim 12)*

Under New Jersey law, "fraud or misrepresentation consists of the following elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge of

---

[39]   Plaintiffs contend that defendants also breached an implied warranty of fitness for a particular purpose.  Such an allegation is not in the Second Amended Complaint.  If it were, it would be dismissed.  An implied warranty of fitness for a particular purpose use arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."  *Potler v. MCP Facilities Corp.*, 471 F. Supp. 1344, 1349 (E.D.N.Y. 1979).  Plaintiffs allege that their "particular purpose" for purchasing vitaminwater was to drink a "healthy" beverage.  However, the Second Amended Complaint does not allege that defendants knew any particular plaintiff purchased vitaminwater for that purpose.  Consumers may seek beverages for a variety of purposes; indeed some may desire the beverage precisely because it contains high levels of sugar.

the falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; (4) justifiable reliance of the misrepresentation; (5) resultant damage." *Cipollone v. Liggett Group, Inc.*, 683 F. Supp. 1487, 1499 (D.N.J. 1988) (citations omitted); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (substituting "reasonable reliance" as fourth element).  Failure to disclose facts may constitute misrepresentation where the facts concealed were "'significant and material.'" *Id.* (citation omitted).

Under California law, "to state a claim for negligent misrepresentation, a plaintiff must allege: (1) the defendant made a misrepresentation of a past or existing material fact; (2) without reasonable grounds for believing it to be true; (3) with intent to induce another's reliance on the fact misrepresented; (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed; and (5) damages." *Stevens v. JPMorgan Chase Bank, N.A.*, No. C 09-03116 (SI), 2010 WL 329963, at *6 (N.D. Cal. Jan. 20, 2010) (citing *B.L.M. v. Sabo & Deitsch*, 64 Cal. Rptr. 2d 335, 342 (Ct. App.1997)).

To sustain claim for intentional misrepresentation under New York law, a plaintiff must show that: (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance.  *B & M Linen, Corp. v. Kannegiesser, USA, Corp*., 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010).  The Court of Appeals of New York has stated that "[A] negligent statement may be the basis for recovery of damages, where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage, but such information is not actionable unless expressed directly, with knowledge or notice that it will be

acted upon, to one to whom the author is bound by some relation of duty, arising out of contract

or otherwise, to act with care if he acts at all."  *White v. Guarente*, 43 N.Y.2d 356, 363-64 (1977)

(citation omitted).

Defendants contend that each deceit/misrepresentation claim must be dismissed

because it has not been pled with sufficient particularity.  Although the New Jersey claims must

be dismissed because they are not pled with sufficient particularity, the New York and California

claims have both adequately alleged a claim for intentional or negligent misrepresentation.  As

discussed above, the California claims have been pled with sufficient particularity.  With respect

to the New York claims, the Second Amended Complaint alleges that plaintiff Batsheva

Ackerman purchased vitaminwater's "revive" and "multi-v" flavors at their premium price

approximately one to two times per week between October 2007 and October 2008 from various

drug stores such as Duane Reade located in New York.  When considered alongside the

allegations already discussed, this suffices to plead plaintiffs New York claims with particularity.

Accordingly, a deceit/misrepresentation claim is adequately pled by the New York and

California plaintiffs, but is dismissed with respect to the New Jersey plaintiffs.

7.      *Unjust Enrichment (Claim 13)*

Unjust enrichment is an equitable remedy requiring "that a plaintiff show that a

defendant benefitted at plaintiff's expense, and equity and good conscience require plaintiff to

recover.  *Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 354 (E.D.N.Y. 2008)

(citation omitted).  "A disgruntled customer may only bring a claim if he received 'less than

what he bargained for.'  *Id.* (citing *In re Canon Cameras*, 237 F.R.D. 357, 359 (S.D.N.Y. 2006)).

Defendants sole basis for dismissal of the unjust enrichment claim is that they believe all of the

remaining claims fail as well.  Because that premise has been rejected, the unjust enrichment claim will not be dismissed.

CONCLUSION

For the reasons set forth above, defendants' motion to dismiss claims nine, ten, and eleven is granted without prejudice to a timely amendment consistent with this opinion.  The motion is denied in all other respects.

So Ordered.

John Gleeson, U.S.D.J.

Dated: July 21, 2010
       Brooklyn, New York